UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DERRICK CAIN,

      Plaintiff,
                                    Case No. 19-cv-11278
                                    Hon. Matthew F. Leitman

v.

BRIAN RINEHART, *et al.*,

      Defendants.

_____/

**<u>ORDER (1) SUSTAINING DEFENDANT'S OBJECTIONS (ECF No. 39) TO
AMENDED REPORT AND RECOMMENDATION (ECF No. 38),
(2) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
ON FOURTH AMENDMENT UNLAWFUL ENTRY CLAIM (ECF No. 32),
AND GRANTING DEFENDANT LEAVE TO FILE A SECOND MOTION
FOR SUMMARY JUDGMENT ON STATE-LAW CLAIMS</u>**

On May 2, 2019, Plaintiff Derrick Cain, appearing *pro se*, filed this action
against United States Marshal Brian Rinehart and others pursuant to 42 U.S.C.
§ 1983. (*See* Compl., ECF No. 1.)  Cain alleges that Rinehart violated his (Cain's)
Fourth Amendment rights and committed several state-law torts when Rinehart
entered his home while attempting to locate and arrest Cain's nephew, Corey Mathis.
(*See id.*, PageID.2.)

Rinehart has now moved for summary judgment. (*See* Mot. for Summ. J., ECF
No. 32.)  On May 11, 2021, the assigned Magistrate Judge issued a report and
recommendation in which she recommended that the Court deny the motion with

respect to Cain's Fourth Amendment unlawful entry claim (the "R&R"). (*See* R&R, ECF No. 38.)  She further recommended that the Court decline to dismiss Cain's state-law tort claims because Rinehart had not specifically addressed those claims in his motion. (*See id.*)  Rinehart filed timely objections to the R&R on May 25, 2021. (*See* Objections, ECF No. 39.)

The Court finds persuasive the Magistrate Judge's analysis and conclusion that Rinehart's entry into Cain's residence (as described by Cain) did not comply with the Fourth Amendment.  However, for the reasons explained below, the Court concludes that Rinehart is nonetheless entitled to qualified immunity with respect to Cain's Fourth Amendment claim because Cain has not shown that Rinehart violated his clearly established Fourth Amendment rights.

The Court therefore **SUSTAINS** Rinehart's objections to the R&R and **GRANTS** his motion for summary judgment on Cain's Fourth Amendment unlawful entry claim.  The Court further **GRANTS** Rinehart leave to file a second summary judgment motion directed at Cain's state-law claims.

# I

The facts of this dispute are described in detail in the R&R. (*See* R&R, ECF No. 39, PageID.275-279.)  In brief summary, Rinehart has worked for the Wayne County Sheriff's Office since 2003. (*See* Rinehart Decl. at ¶1, ECF No. 32-3, PageID.144.)  In 2016, he was "temporarily deputized to participate in a U.S.

2

Marshals Task Force" that was "comprised primarily of local and state police officers." (*Id.* at ¶2, PageID.144.)  "The purpose of the task force was to locate and arrest fugitives and individuals on arrest warrants." (*Id.* at ¶3, PageID.144.)  Rinehart led a "five-man team [that] executed a couple hundred arrest warrants per year." (*Id*.)

In April or May of 2016, Rinehart's task force sought to locate and arrest a man named Corey Mathis. (*See id.* at ¶4, PageID.145.)  Mathis was fugitive who had absconded from his term of probation. (*See* Mathis Criminal File, ECF No. 35-2, PageID.133.)  A warrant had been issued for Mathis' arrest. (*See id.*, PageID.132, 136-37.)

In attempting to locate Mathis, Rinehart "searched several databases to determine [Mathis'] address." (Rinehart Decl. at ¶4, PageID.145.)  "Those databases showed that Mathis'[] address was 12016 Glastonbury in Detroit, Michigan" (the "Glastonbury Home"). (*Id.*)  The Glastonbury Home is owned by Cain.  Mathis had lived at the Glastonbury Home in 2012, but Cain evicted Mathis at that time "due to [his drug] addiction[s]." (Mathis Decl., ECF No. 35-5, PageID.178.)  Notably, even after Mathis moved out of the Glastonbury Home in 2012, he would often provide the address of that residence as his address so that he could "remain on the streets" and avoid police detection.[1] (*See id.*)

---

[1] Cain "does not dispute" that Mathis had identified the Glastonbury Home as his (Mathis') home address during the relevant time period. (Resp. to Objections, ECF No. 41, PageID.348.)

Rinehart and his team arrived at the Glastonbury Home at around 9:00 a.m. on May 5, 2016. (*See* Cain Dep. at 28-29, ECF No. 32-4, PageID.159-160.)  After Rinehart's team knocked on the door, Cain opened the door and spoke to the officers through a locked screen. (*See id.* at 29, PageID.160.)  Rinehart told Cain that his team was looking for Mathis, and Cain responded that Mathis had not lived at the Glastonbury Home since 2012. (*See id.* at 33, PageID.162.)   Cain also told the officers that the only other person at the Glastonbury Home at the time was his nephew, Deonte Morris. (*See* Resp. to Objections, ECF No. 41, PageID.350.)  Cain had Morris come to the door so the officers could confirm Morris was not in fact Mathis. (*See id.*)  Cain denied the officers entry into the Glastonbury Home and told them to return with a search warrant. (*See* Cain Dep. at 34, ECF No. 32-4, PageID.163.)  Cain then began arguing with Rinehart about whether Mathis lived at the Glastonbury Home and whether Rinehart needed a search warrant to enter the home. (*See id.*)  Cain concluded that the "conversation [with] Rinehart was going nowhere[,] so [he] slammed the door in [Rinehart's] face." (Resp. to Mot. for Summ. J., ECF No. 33, PageID.185.)

A while later, Cain re-opened his front door (while still standing behind the locked screen). (*See id.*)  At that time, Rinehart and the officers had "a completely different demeanor," and Cain again began arguing with them. (*Id.*)  Rinehart then gave an order to tear Cain's locked screen down so the officers could enter the

Glastonbury Home. (*See* Cain Dep. at 40, ECF No. 32-4, PageID.168.)   After Rinehart gave that order, Cain opened the locked screen and stepped out onto his porch. (*See id.*)   When he did so, officers pointed their guns at him and "tackled" him to the ground. (*Id.* at 41, PageID.169.)   Cain was then handcuffed as the officers searched the Glastonbury Home for Mathis. (*See id.*)   When the officers concluded that Mathis was in fact not in the Glastonbury Home, they uncuffed Cain and left the property. (*See id.* at 46, PageID.174.)

## II

### A

Cain, appearing *pro se*, filed this action against Rinehart and other unknown members of Rinehart's task force on May 2, 2019. (*See* Compl., ECF No. 1.) Rinehart is the only Defendant who has been served with the Complaint.   In the Complaint, Cain alleges that Rinehart violated his (Cain's) Fourth Amendment rights "to be safe and secure in his home" when Rinehart and his team "forcefully entered [Cain's] home unreasonably without a search warrant or any probable cause to believe that [Mathis] resided at [Cain's] home or that he was there [at the time of the raid]" (the "Unlawful Entry Claim"). (*Id.* at ¶11, PageID.3.)   Cain also claims that the conduct of Rinehart and his team constituted "assault and battery, false imprisonment, [invasion of privacy,] and false arrest under state law" and caused Cain to suffer "emotional distress" (collectively, the "State Law Claims"). (*Id.* at

¶12, PageID.3.)  Cain seeks "monetary, compensatory, and punitive damages[] in the amount of $20,000.00, and any other relief the [C]ourt finds just." (*Id.*)

## B

Rinehart filed a motion for summary judgment on December 2, 2020. (*See* Mot. for Summ. J., ECF No. 32.)  Rinehart argued that he is entitled to qualified immunity with respect to the Unlawful Entry Claim because, among other things, "there is no clearly established law indicating that [he] violated Cain's Fourth Amendment rights." (*Id.*, PageID.126.)  He insisted that "[a]t worst, Cain alleges the kind of honest mistake that the doctrine of qualified immunity was created to protect." (*Id.*, PageID.127.)  Rinehart did not specifically address the State Law Claims in his motion.[2]

---

[2] In Rinehart's summary judgment motion, he also moved for summary judgment on two additional Fourth Amendment claims that he believed Cain had brought against him: (1) an illegal seizure claim (2) an excessive force claim. (*See* Mot., ECF No. 32, PageID.121-126.)  But Cain does not appear to be bringing either claim in his Complaint.  Indeed, Cain's Fourth Amendment claim is limited to the assertion that Rinehart and his team "entered [Cain's] home unreasonably without a search warrant or any probable cause to believe [Mathis] resided at the [Glastonbury Home] or that he was there [at the time]." (Compl. at ¶11, ECF No. 1, PageID.3.)  To the extent Cain brings claims arising out of his seizure and the amount of force Rinehart applied to effectuate that seizure, he brings those claims exclusively under state law. (*See id.* at ¶12, PageID.3, where Cain alleges that his "seiz[ure] … constitute[d] assault and battery, invasion of privacy, false arrest, as well as false imprisonment" under "state law").  Rinehart did not address the viability of those claims under state law in his summary judgment motion.

**C**

The assigned Magistrate Judge issued the R&R on May 11, 2021. (*See* R&R, ECF No. 38.)  She recommended that the Court deny Rinehart's motion to the extent it sought summary judgment on the Unlawful Entry Claim. (*See id.*, PageID.279-288.)  She concluded that the evidence, viewed in the light most favorable to Cain, was "insufficient" to justify Rinehart's entry into the Glastonbury Home. (*Id.*, PageID.282-283.)  She also determined that Rinehart was not entitled to qualified immunity. (*See id.*, PageID.286-287.)  Finally, the Magistrate Judge recommended that the Court not dismiss the State Law Claims because Rinehart "did not move for summary judgment" on those claims. (*See id.*, PageID.291.)

**D**

Rinehart filed objections to the R&R on May 25, 2021. (*See* Objections, ECF No. 39.)  Rinehart argues that he is entitled to qualified immunity with respect to the Unlawful Entry Claim because (1) his entry into the Glastonbury Home did not violate the Fourth Amendment and (2) even if it did, Rinehart did not violate Cain's clearly established constitutional rights. (*See id.*) In addition, in a footnote, and for the first time, Rinehart insists that "[t]o the extent that [the State Law Claims] are not subsumed in [Cain's] constitutional claims, [he] is absolutely immune from state law tort claims under the Westfall Act and this Court lacks jurisdiction over such claims." (*Id.*, PageID.301 n.1, citing 28 U.S.C. § 2679(b)(1) and 28 U.S.C. § 2675.)

Cain filed a response to the objections on June 24, 2021. (*See* Resp. to Objections, ECF No. 41.)

## III

When a party objects to portions of a Magistrate Judge's report and recommendation, the Court reviews those portions *de novo. See* Fed.R.Civ.P. 72(b)(3); *Lyons v. Comm'r of Soc. Sec.*, 351 F.Supp.2d 659, 661 (E.D. Mich. 2004). The Court has no duty to conduct an independent review of the portions of a report and recommendation to which the parties did not object. *See Thomas v. Arn*, 474 U.S. 140, 149 (1985).

## IV

"Qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016) (internal quotation marks omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). "This immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions,' 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). Once a defendant raises a qualified immunity

defense, the "plaintiff bears the burden of showing that [the] defendant is not entitled to qualified immunity." *Id.*

"A qualified-immunity inquiry involves two questions: whether defendants violated a constitutional right and whether that right was clearly established." *Brown*, 814 F.3d at 457. "These questions may be answered in any order; if either one is answered in the negative, then qualified immunity protects the official from civil damages." *Id.* "On summary judgment, the court must analyze these questions after construing the facts in the light most favorable to the party asserting the injury and drawing all reasonable inferences in that party's favor." *Id.*

When determining whether an individual's rights are clearly established for purposes of qualified immunity, "[t]he sources of clearly established law to be considered are limited. [Courts in this Circuit] look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the Sixth] [C]ircuit, and finally to decisions of other circuits." *Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013). Courts "must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *District of Columbia v. Wesby*, 138 S.Ct. 577, 590 (2018) (quoting *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014)). Indeed, a court's task "requires a high 'degree of specificity.'" *Id.* (quoting *Mullenix*, 136 S.Ct. at 309). This

specificity "is 'especially important in the Fourth Amendment context.'" *Id.* (quoting *Mullenix*, 136 S.Ct. at 308). It is why the Supreme Court has "stressed the need to 'identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment.'" *Id.* (quoting *White v. Pauly*, 137 S.Ct. 548, 552 (2017)). And "[w]hile there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the particular arrest 'beyond debate.'" *Id.* (quoting *Al-Kidd*, 563 U.S. at 741). Thus, as the Sixth Circuit has explained, a "defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate.'" *Wenk v. O'Reilly*, 783 F.3d 585, 598 (6th Cir. 2015) (quoting *Plumhoff*, 134 S.Ct. at 2023).

## V

The Court proceeds directly to the question of whether Cain had a clearly established Fourth Amendment right to be free from Reinhart's entry into the Glastonbury Home. As explained below, the Court concludes that he did not. Rinehart is therefore entitled to qualified immunity on the Unlawful Entry Claim.

10

**A**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.  As the Supreme Court has explained, "because 'the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed[,] ... [i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (quoting *Payton v. New York*, 445 U.S. 573, 585-86 (1980)).  "Thus, unless one of the 'few well-defined and carefully circumscribed circumstances' justifying a warrantless entry exists, the Fourth Amendment reasonableness standard 'generally requires that police obtain a warrant based upon a judicial determination of probable cause prior to entering a home.'" *Id.* (quoting *Thacker v. City of Columbus*, 328 F.3d 244, 252 (6th Cir. 2003)).

"[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* at 416 (quoting *Payton*, 445 U.S. at 603).  The Sixth Circuit has established a two-part test to determine whether an officer may enter a home pursuant to an arrest warrant: did the officer have a reasonable belief or probable cause to believe that the suspect (1)

11

"lived" at the residence at issue and (2) "was inside the residence at the time that [the officer] entered."[3] *Id. See also United States v. Pruitt*, 458 F.3d 477, 483 (6th Cir. 2006) (explaining that "an arrest warrant is sufficient to enter a residence if the officers, by looking at common sense factors and evaluating the totality of the circumstances, establish a reasonable belief that the subject of the arrest warrant is within the residence at that time").

**B**

Cain has not identified any case law that clearly establishes that Rinehart's entry into the Glastonbury Home was unlawful under the applicable two-part test.

First, the cases cited by Cain do not clearly establish that it was unreasonable for Rinehart to conclude that Mathis lived at the Glastonbury Home. As a general matter, a suspect's "first-hand statement that he lived at [an] address [is] likely sufficient to create an objectively reasonable belief that he resided there." *El Bey*, 530 F.3d at 416. *See also United States v. Barrera*, 464 F.3d 496, 501 (5th Cir. 2006) (concluding that officers had reasonable belief that fugitive was at a particular house

---

[3] The Sixth Circuit has not taken a definitive position on whether "the proper standard for evaluating the quantum of proof required for police officers to enter a residence to execute an arrest warrant" is reasonable belief or probable cause. *United States v. Hardin*, 539 F.3d 404, 410 (6th Cir. 2008). *See also United States v. Lewis*, 676 F. App'x 440, 444-45 (6th Cir. 2017) (noting that the Sixth Circuit has "remained undecided" on the "open question whether reasonable belief or probable cause is required") (internal quotation marks omitted). The Court need not determine which standard applies here because it would reach the same result under either standard.

because, among other things, the fugitive had "given the address as his place of residence" to authorities and a bail bondsman).   Here, as Cain acknowledges, roughly six months before Rinehart's team came to Glastonbury Home, Mathis told authorities that he lived at that address. (*See* Resp. to Objections, ECF No. 41, PageID.349, 351-52. *See also* Mathis Decl. ECF No. 35-5, PageID.178.)  Cain has not shown that it was unreasonable for Rinehart to conclude, based upon Mathis' own statements, that Mathis lived at the Glastonbury Home.

Cain contends that it was not reasonable for Rinehart to conclude that Mathis lived at the Glastonbury Home because the information tying Mathis to that home was six months old.  In support of that contention, he cites the First Circuit's decision in *United States v. Hamilton*, 819 F.3d 503 (1st Cir. 2016). (*See* Resp. to Objections, ECF No. 41, PageID.349-350.)  But *Hamilton* actually undercuts Cain's position.  In *Hamilton*, the First Circuit held that an address provided by a suspect six months earlier was *not* too old to be relied upon by authorities. *See Hamilton*, 819 F.3d at 507 ("Even if Hamilton is correct that the address on the warrant was based on the information that Tommy Smith provided at the time of his August 2010 arrest and did not represent any more recent information, that information was still only six months old").  And other courts have held that it was reasonable for officers to rely on information that was even older than the information Mathis provided here. *See*, *e.g.*, *Payton v. City of Florence, Ala.*, 413 F. App'x 126, 131-32 (11th Cir. 2011)

(rejecting argument that "nine-month time lag between [suspect's] arrest (at which time he provided the [plaintiff's] address on the warrant) and the officers' search of [plaintiff's] home eroded the reasonableness of the address information"); *United States v. Bervaldi,* 226 F.3d 1256, 1264-66 (11th Cir. 2000) (concluding that police could rely on information that was nearly seven months old when determining whether a suspect lived at a particular residence).

Second, Cain has not cited any cases that clearly establish that it was unreasonable for Rinehart to conclude that Mathis was inside the Glastonbury Home when he (Rinehart) entered.  Cain points to the Sixth Circuit's decision in *United States v. Hardin*, 539 F.3d 404 (6th Cir 2008).  Cain's reliance on *Hardin* is understandable.  That decision includes language that casts doubt on the validity of Rinehart's conclusion that Mathis was in the Glastonbury Home.  But for the reasons explained below, *Hardin* does not clearly establish that that conclusion was unreasonable.

*Hardin* involved the arrest and subsequent prosecution of a man named Malik Hardin.  In 2005, Hardin "was released from prison and put on federal supervised release." *Id.* at 407.  Later that year, "a federal warrant for Hardin's arrest [was] issued following a petition to revoke his supervised release." *Id.*  A confidential informant later provided authorities a tip about Hardin's potential whereabouts.  The informant told officers that Hardin "might be staying with a girlfriend" at a particular

apartment complex. *Id.* The informant also "described the vehicle that he believed Hardin to be driving, but [the informant] could not identify which particular apartment he believed Hardin to be staying in, only its approximate area in the [apartment] building." *Id.*

Officers then went to the apartment building in question. The officers "spotted what they believed to be the described vehicle" near apartment unit 48. *Id.* The officers then spoke with the manager of the apartment building, who "informed them that Hardin had not leased any apartment and that the manager had not seen him on the property." *Id.* The manager told the officer that a woman, not Hardin, had rented apartment 48. *See id.*

The officers then convinced the manager to enter apartment 48 in order to determine whether Hardin was present there. The manager did so under the false pretense that he needed to check on a water leak. *See id.* After the manager confirmed that Hardin was inside the apartment, the officers entered the apartment and arrested Hardin. *See id.* at 408. Officers also seized several firearms and drugs belonging to Hardin. *See id.*

Hardin moved to suppress evidence seized during his arrest. He argued that "although the officers had a warrant for his arrest … the officers lacked probable cause to believe that he was present in the apartment where he was staying as a guest." *Id.*

15

The Sixth Circuit agreed that the entry into the apartment was unlawful. The court first concluded that the apartment manager was acting as an agent of the government, so the court disregarded his confirmation that Hardin was inside the apartment. *See id.* at 420. The court then addressed whether the information provided "by the confidential informant alone established sufficient reason to believe that Hardin was inside [a]partment 48." *Id.* The court concluded that it did not. *See id.*

The court surveyed cases in which courts had ruled that officers had a reasonable belief that a suspect named in an arrest warrant would be inside a residence. *See id.* at 422-23. The court observed that a "common feature of th[o]se cases [was] recent, eyewitness evidence connecting the suspect [named in the arrest warrant] to the residence." *Id.* at 421. They also "typically involve[d] [] recent and firsthand knowledge [of the suspect's location] or involve[d] evidence of the suspect's own conduct." *Id.* at 422. These observations are helpful to Cain here – and lend substantial support to the conclusion that the entry into the Glastonbury Home was unlawful – because Rinehart did not have any recent, eyewitness evidence or firsthand knowledge connecting Mathis to the Glastonbury Home at the time of entry.

But the court in *Hardin* did not adopt a categorical rule that an officer's belief that a suspect will be found in a residence is reasonable only if that belief is based upon recent, eyewitness evidence or firsthand knowledge. *See id.* at 423 (explaining that the court analyzed the "common features" cases "simply [to] illustrate the gulf separating the amount and quality of knowledge possessed by the officers in [*Hardin*] from the officers in those cases in which entries have been found lawful."). Instead, the court in *Hardin* explained that a district court must assess the reasonableness of an officer's belief that a suspect is in a residence based upon "common sense factors and the *totality* of the circumstances." *Id.* at 420 (emphasis added) (citing *Pruitt*, 458 F.3d at 483). No single circumstance – even often-important circumstances such as the presence (or absence) of recent, eyewitness evidence or firsthand knowledge – is dispositive.[4]

---

[4] In *Pruitt*, the Sixth Circuit cited with approval decisions that it described as holding that proof other than recent, eyewitness evidence or firsthand knowledge supported an officer's reasonable belief that a suspect would be in a residence. *See Pruitt*, 458 F.3d at 483 (citing *United States v. Lauter*, 57 F.3d 212, 215 (2d Cir. 1995), favorably and describing the *Lauter* as "holding that informant's tip that suspect was unemployed and liked to sleep late was sufficient to establish reasonable belief that suspect was in apartment" and citing *United States v. Thomas,* 429 F.3d 282, 286 (D.C. Cir. 2005), favorably and describing *Thomas* as "deciding that early morning hour of entry was sufficient to establish reasonable belief that suspect would be home.").

The decision in *Hardin* turned on the weakness of the particular evidence tying Hardin to the apartment that the officers entered.  For example, the informant in *Hardin* provided "relatively little information," and the information that he did provide was conditional and filled with caveats. *See id.* at 421.  Importantly, the informant "did *not* say when [the informant] had last seen Hardin or even that [the informant] had ever seen Hardin at that apartment." *Id.* (emphasis in original).  All the informant told the officers was that "*if* Hardin was staying in the area, he would likely be at a particular described, but unidentified apartment leased to an unidentified woman." *Id.* at 423 (emphasis in original).  And, prior to the raid, the officers learned that "the apartment manager had never seen Hardin before." *Id.*  The Sixth Circuit held that the officers' entry into the apartment violated the Fourth Amendment because they had "essentially *no* evidence to indicate that Hardin was *then* inside the apartment." *Id.* at 423-24 (emphasis in original).

The circumstances surrounding the entry into the apartment in *Hardin* differ in potentially significant ways from the circumstances surrounding the entry into the Glastonbury Home.  Here, unlike in *Hardin*, Mathis had self-reported his home address as the Glastonbury Home.  So there was concrete evidence from Mathis himself, not mere speculation from a confidential informant, tying Mathis to the Glastonbury Home.  Moreover, at the time of Rinehart's entry, there were additional circumstances, not present in *Hardin*, that courts have recognized as lending support

18

to an officer's belief that a suspect is in a residence.  For example, Rinehart knew that Mathis was a fugitive from justice (*see* Mathis Criminal File, ECF No. 35-2, PageID.133), and, as the Tenth Circuit has explained, the fact that a fugitive has "absconded and was hiding from law enforcement" makes it "incrementally more likely that he would be holed up at home rather than out and about." *United States v. Denson*, 775 F.3d 1214, 1217 (10th Cir. 2014).  Moreover, Cain did not merely deny that Mathis was present at the Glastonbury Home.  Instead, Cain argued with Rinehart and several other officers, and, by his own description, he "slammed" his front door in Rinehart's face. (Resp. to Mot. for Summ. J., ECF No. 33, PageID.185.) Courts have recognized that a "vehement[] deni[al] that [a fugitive] was present within [a] residence" by family members could "raise[] a 'red flag' that [the family members] were 'covering' for [the suspect] and that [the suspect] was actually within the residence." *Barrera*, 464 F.3d at 504. *See also Smith v. Tolley*, 960 F. Supp. 977, 988-89 (E.D. Va. 1997) (explaining that it was "reasonable for [officer] to believe that [a husband] was evading [] questions about [his wife's] whereabouts because [he] was trying to conceal the fact that his wife was at home").  Furthermore, Rinehart entered the Glastonbury Home around 9:00 a.m. (*see* Cain Dep. at 28-29, ECF No. 32-4, PageID.159-160), and courts have observed that it reasonable to believe that a person thought to be residing at a particular location would be present

at around that time in the morning.[5] *Denson*, 775 F.3d at 1217 (explaining that "it isn't unnatural to think" that a fugitive would be home "around 8:30 a.m. on a weekday"); *Payton*, 413 F. App'x at 132 ("It was reasonable to conclude that if [the suspect] lived in the house, he would likely be inside at 7:45 a.m."). Finally, as Rinehart explained, "individuals wanted on the type of warrant for which [] Mathis was wanted are not usually employed." (Rinehart Decl. at ¶5, ECF No. 32-3, PageID.145.) And courts have recognized that it may be reasonable to find an unemployed person at home at around the time of Rinehart's entry into the Glastonbury Home. *See, e.g., United States v. Woods*, 560 F.2d 660, 665 (5th Cir. 1977) ("[W]e find it a reasonable anticipation on the officers' part to believe that a person would be at his place of abode, especially at 8:30 in the morning for a man not known to be working"); *Denson*, 775 F.3d at 1217 (same). Given the presence of these additional circumstances, the Court cannot conclude that any reasonable

---

[5] Cain argues that in *United States v. Young*, 835 F.3d 13 (1st Cir. 2016), the First Circuit held that "the time of day is irrelevant[] where there are weak ties to the residence." (Resp. to Objections, ECF No. 41, PageID.353.) But *Young* holds only that "the time of day, *standing alone*, is insufficient" for officers to conclude that a suspect was at a particular location at a particular time. *Young*, 835 F.3d at 22 (emphasis added). *Young* does not suggest that the time of day cannot be one of many factors that could support a reasonable belief or probable cause. Moreover, unlike the officers in *Young*, Rinehart had Mathis' own words connecting him to Glastonbury Home.

officer in Rinehart's position would have understood that he lacked sufficient evidence to conclude that Mathis was in the Glastonbury Home.[6]

In sum, Cain has not cited any case in which a court has held that an entry into a residence to arrest the subject of an arrest warrant violated the Fourth Amendment where, as in this case, (1) the subject of the arrest warrant had listed the residence in question as his own address and (2) at the time of the entry, several circumstances existed that have been recognized by courts as supporting the conclusion that the subject of the warrant was in the residence.[7]  He has thus failed to establish that the entry into the Glastonbury Home violated his clearly established Fourth Amendment rights.  The Court therefore **GRANTS** Rinehart's summary judgment motion with respect to Cain's Unlawful Entry Claim.

---

[6] To be clear: the Court does not mean to suggest that these additional circumstances were legally sufficient to support the conclusion that Mathis was in the Glastonbury Home.  The Court holds only that given these circumstances, it would not have been clear to every reasonable officer that there was a legally insufficient basis for concluding that Mathis was in the residence.

[7] While the Court concludes that Rinehart did not violate Cain's clearly established Fourth Amendment rights, the Court recognizes that Cain has advanced serious and persuasive arguments in support of his Fourth Amendment claim.  Indeed, if the Court had encountered a Fourth Amendment challenge to Rinehart's entry (as described by Cain) in the context of a criminal case – rather than in the context of a civil case in which a qualified immunity defense is available – the Court may well have found a Fourth Amendment violation.

## VI

As explained above, Cain brought several state-law tort claims against Rinehart in the Complaint, and Rinehart did not address those claims in his summary judgment motion.  The Magistrate Judge therefore recommended that the Court should not dismiss the State Law Claims. (*See* R&R, ECF No. 38, PageID.279, 291.)

In a footnote in his objections, Rinehart argues that he is entitled to summary judgment on the State Law Claims because (1) they were "subsumed in his constitutional claims" and (2) to the extent they did not overlap with those claims, Rinehart is "absolutely immune from state law tort claims under the Westfall Act and this Court lacks jurisdiction over such claims." (Objections, ECF No. 39, PageID.301 n. 1.)  The Court declines to consider either of these arguments at this time because Rinehart did not present them to the Magistrate Judge.  Parties are "not allow[ed] … to raise at the district court stage new arguments or issues that were not presented" to the Magistrate Judge. *Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000) (holding that a petitioner's failure to raise a claim before the Magistrate Judge "constitute[d] waiver"). *See also See also AES-Apex Emp'r Servs., Inc. v. Rotondo*, 924 F.3d 857, 867 (6th Cir. 2019) ("[A] district court never abuses its discretion when it holds that an issue not actually presented to a magistrate judge is forfeited").

However, the Court will **GRANT** Rinehart leave to file a second summary judgment motion at this point in the proceedings.  Judicial efficiency will be best served by having Rinehart's additional legal defenses addressed now.

## VII

For all of the reasons stated above, (1) Rinehart's objections (ECF No. 39) to the R&R (ECF No. 38) are **SUSTAINED**; (2) the Court **GRANTS** Rinehart's motion for summary judgment on the Unlawful Entry Claim (ECF No. 32) and dismisses that claim, and (3) the Court **GRANTS** Rinehart leave to file a second summary judgment motion directed at the State Law Claims.  Rinehart shall file his second summary judgment motion not later than **November 1, 2021**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  October 1, 2021

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 1, 2021, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764

23